**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| WOLFSON-VERRICHIA GROUP, INC., <u>et al.</u>, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 5:08-cv-4997 |
| | : | |
| METRO COMMERCIAL REAL ESTATE, | : | |
| INC., <u>et al.</u>, | : | |
| | : | |
| Defendants. | : | |

_____:

**Goldberg, J.**                                                         **March 28, 2013**

<u>**Memorandum Opinion**</u>

This case involves claims against a real estate broker who is alleged to have improperly used its position to convince several retailers to reject a real estate developer's proposed commercial locations.

Plaintiffs, Wolfson-Verrichia Group, Inc. and its affiliates (collectively "Wolfson-Verrichia"), develop, own and operate shopping centers in Pennsylvania and New Jersey. Plaintiffs filed this action on October 21, 2008, asserting claims for breach of the duty to act in good faith, misrepresentation, business disparagement, intentional interference with prospective contractual relations, federal and New Jersey RICO violations, and false advertising.   (Am. Compl., Doc. No. 74.)  They assert that Defendants, Metro Commercial Real Estate, Inc., and its principals and affiliates (collectively "Metro") misused Metro's position as a real estate broker for national retail chains to interfere with Plaintiffs' prospective contracts with those retailers, and convince the retailers to instead open stores in shopping centers in which Metro had a financial interest.  As part of this scheme, Plaintiffs allege that Metro conspired with Defendants

Hughes Development Group, LLC ("Hughes")[1] and Newman Development Group, LLC ("Newman Development"), two commercial real estate companies that, like Wolfson-Verrichia, develop and market shopping centers in Pennsylvania and New Jersey.

Defendants have moved for summary judgment, arguing that Plaintiffs' evidence is insufficient to support a finding that their conduct was the proximate cause of any retailer's decision to decline to open a store in Wolfson-Verrichia's shopping centers.[2] Plaintiffs disagree, and base their opposition in substantial part on the opinions offered by their expert, Kenneth Leonard, who has opined that Defendants' improper conduct caused retailers to reject the business projects promoted by Plaintiffs. Defendants have moved to exclude Leonard's opinions, and consequently, we will consider that motion together with their motion for summary judgment. As set forth below, we find that Leonard's causation opinions are inadmissible, and that Plaintiffs have failed to produce sufficient evidence to survive summary judgment.

I.      **Factual Background**[3]

Wolfson-Verrichia is in the business of developing retail shopping centers. Generally, this involves identifying market areas in need of development, finding an appropriate property

---

[1] Defendant Hughes was formed by Metro's founder, Daniel Hughes, and some of its owners are also owners of Metro. The only allegation or wrongdoing against Hughes in Plaintiffs' complaint is that it "from time to time helped" Metro's principals convince retailers to reject Plaintiffs' sites in favor of those that Metro's principals were financially interested in. (Am. Compl., ¶¶ 175-176.) Consequently, there is little discussion of Hughes in this opinion. This general allegation is not sufficient to survive summary judgment. Additionally, Plaintiffs' claims against Hughes fail for the reasons discussed herein.

[2] Defendants also offer other arguments as to why summary judgment is appropriate. However, we need not address them given our conclusion that Plaintiffs have provided insufficient evidence of causation.

[3] The facts described in this section are either undisputed or taken in the light most favorable to Plaintiffs.

within the market area, and working with various parties to develop the property into a retail shopping center.  Wolfson-Verrichia finds potential tenants, seeks zoning, development, traffic and environmental approvals from the appropriate governmental agencies, and finances and acquires the property.  (Verrichia Dep., 7/1/10, pp. 59-60.)  According to Wolfson-Verrichia, finding potential tenants is particularly crucial to the development process, and construction or zoning plans will not proceed until enough retailers have signed non-binding commitments.  (Id.; V. Compl. ¶ 19.)

While developers like Wolfson-Verrichia are trying to attract retailers to their sites, national retail chains with long-term plans for expansion are also seeking out opportunities for new stores in underserved market areas.  (See, e.g., Case Dep., pp. 11-13.)  The retailers involved here that were represented by Metro—Target, Giant Foods ("Giant") and Lowe's— testified to using substantially identical methods to locate sites for their stores.  These retailers all had internal real estate departments tasked with evaluating potential opportunities for expansion. (See id.; Robinson Dep., pp. 13-16; Perez-Daple Dep., pp. 20-22.)  When a particular site was first brought to the attention of the real estate department, an initial analysis was normally performed to determine whether it fit the retailers' criteria for expansion, including consideration of square footage, price, demographics, traffic and proximity to existing locations and competitors.  (Robinson Dep., p. 16; Perez-Daple Dep., pp. 22, 83-86.)  If a site met the initial criteria, a more thorough investigation was undertaken.  (Mahowald Dep., pp. 13-14; Perez-Daple Dep., p. 38.)  For many stores, like Giant, approval from the real estate committee was required before the process moved past the initial investigation stage. (Id., p. 21.)

After the initial investigation, the retailers normally performed in-person visits to the potential site, and conducted further analyses of the area's demographics, potential sales,

3

geography and other retail in the area.  (See, e.g., Robinson Dep., p. 177; Perez-Daple Dep., p. 38.)  Based upon this assessment, the real estate department decided whether it was interested in the site and presented its recommendation to the company's real estate committee.  (Perez-Daple Dep., pp. 22, 37-39.)  If the committee gave final approval, preliminary lease negotiations with the site's developer normally began, ideally culminating in an agreement to lease the space and open a store in the development.  (Robinson Dep., 5/11/10, p. 22; Perez-Daple Dep., pp. 38-39.)  Some retailers, like Target and Giant, would sometimes send the developer a non-binding "Letter of Intent," advising the developer that it intended to sign as a tenant in the development.  (See Case Dep., pp. 104-105; Robinson Dep., pp. 231-33; but see Perez-Daple Dep., p. 37 (Lowe's does not send Letters of Intent).)

In addition to relying upon their internal real estate departments, many retailers use real estate brokers like Metro to help them "keep up with market conditions and potential site availability."  (Case Dep., p. 13.)[4]  Brokers like Metro also serve as "a point of contact for land owners and potential developers" and help "screen all the opportunities" available in a particular market.  (Id.; see also Chadwick Dep., pp. 23-24, 30.)

Plaintiffs' claims relate to their attempts to develop two retail shopping centers—the Maiden Creek project near Reading, Pennsylvania, and the Woolwich project near Deptford, New Jersey—between 2002 and 2007.  The retailers Wolfson-Verrichia pursued for these developments included Target, Giant and Lowe's, which employed Metro as their real estate broker in both Pennsylvania and New Jersey.  Each of these retailers considered opening a store

---

[4] Lowe's differed from the other retailers in this respect.  Although Lowe's sometimes, as a matter of practice, worked exclusively with one retailer in a region, it did not enter into any written agreements with brokers and sometimes worked with multiple brokers in one region. (Perez-Daple Dep., pp. 20-21, 48-49.)  As it relates to this case, Lowe's did not have a brokerage agreement with any of the parties.  (Id., pp. 20-21.)

at one of Plaintiffs' developments, as well as other competing developments in the area. Ultimately, none of the retailers decided to become tenants, and the Maiden Creek and Woolwich projects remain undeveloped.

### A.      Plaintiffs' Discussions With Target

Wolfson-Verrichia's talks with Target began in early 2003.  (Pls. SOF ¶¶ 22, 69.)   In May of that year, Metro sent Target a letter outlining the development opportunities in the Reading area, including Wolfson-Verrichia's Maiden Creek site.  (Wolson Decl., Ex. 14.) Shortly thereafter, Thomas Verrichia from Wolfson-Verrichia pitched the Maiden Creek site to representatives from Target and Metro at the International Council of Shopping Centers ("ICSC") in Las Vegas.  (Pls. SOF ¶ 24; Verrichia Dep., 7/1/10, pp. 94-98.)  Verrichia presented information to Target and Metro about both Maiden Creek and Woolwich, but Steve Niggeman from Metro told him after the meeting that Target was focused on expansion in other market areas.   Niggeman relayed that Target believed it was "premature" to consider a store near Maiden Creek, and that the market around the Woolwich project was "too light."  (Verrichia Dep., 7/1/10, pp. 66, 96-98, 233.)

Nonetheless, over the next eighteen months Wolfson-Verrichia continued to pursue Target as a tenant by providing periodic verbal and written updates on its developments to Metro and directly to Target.   (Verrichia Dep. 7/1/10, pp. 143-146, 148.)   Target gave serious consideration to opening a store at Maiden Creek.  (See Mahowald Dep., pp. 18-19.)  Its Director of Real Estate, Laurie Berkwitz, visited the site twice in 2004 while on a tour of developments in that area.  (Id.)  During her second trip, which occurred in October 2004, Berkwitz also visited a location in nearby Muhlenberg (the "Berks" site), which was not being actively developed at the time.  (Wolson Decl., Ex. 17.)   Berkwitz felt that Berks was in a good location for a retail

shopping center, and, following the trip, she reported to Metro that she thought the Berks location "would be a great corner for a big development," but was "one the fence" about the Maiden Creek property, which was "a little too remote," although it had "new housing growth and exiting housing stock" nearby.  (Wolson Decl., Ex. 19.)

Although Target was considering the Maiden Creek and Berks projects, Verrichia testified that Metro consistently told him the opposite—that Target was not ready to consider opening a store in the area.  (Verrichia Dep., 7/1/10, pp. 130-32, 236-37.)  Despite Metro's representations, Verrichia continued to provide Target and Metro with updates about Maiden Creek throughout 2005 and 2006.  (See, e.g., Wolson Decl., Exs. 20, 47-49.)  Eventually, Defendant Newman Development began efforts to develop a shopping center at the Berks site, and Target decided to open a store there rather than at Maiden Creek.

According to Laurie Berkwitz, she and members of Target's senior management felt that Berks "was busier, there [were] more people around it, [and] there was more retail around it." (Mahowald Dep., p. 22.)  On the other hand, they felt that Maiden Creek was "too remote" and "while it may have promise in the future and had some nice housing, it wasn't a move for Target at that particular moment."  (Id.)  Importantly, Berkwitz testified that Target reached this conclusion based upon the analyses performed by its market research and analysis team, who also toured the area.  (Id., pp. 22-23.)  She emphasized that none of the Defendants—neither Metro, Hughes, nor Newman Development—influenced her recommendation, or Target's decision to reject the Maiden Creek project.  (Id.)

Wolfson-Verrichia also pursued Target as a tenant for its Woolwich project in New Jersey.  Thomas Verrichia presented that project along with the Maiden Creek project to Target at the May 2003 ICSC Conference.  As with the Maiden Creek project, Metro told Wolfson-

6

Verrichia that Target was uninterested in opening a store in the area near Woolwich. (Verrichia Dep., 7/1/10, pp. 66, 233.) Metro continued to deliver this message to Plaintiffs over the next eighteen months. (Id., pp. 236-37.) However, Verrichia was told otherwise by a representative from Lowe's at a February 2005 lunch meeting. At that meeting, which also included a representative from Metro, Verrichia was told that Lowe's understood Target was considering two projects near Woolwich—the Mantua and Logan projects. (Id.) Afterwards, Wolfson-Verrichia began sending information about the Woolwich project directly to Target's real estate department rather than relying on Metro. (See, e.g., Wolson Decl., Ex. 22.)

Wolfson-Verrichia continued discussions with Target and Metro regarding the Woolwich project through 2005, and in February 2006, Wolfson-Verrichia and Metro discussed entering a commission agreement that would entitle Metro to a commission if Target agreed to sign a lease at Woolwich. (Wolson Decl., Ex. 23.) Although this agreement was never consummated, Metro arranged for representatives from Target to tour the Woolwich site and meet with Verrichia in March 2006. (Verrichia Dep., 7/1/10, pp. 326-28.) In anticipation of the meeting, Verrichia sent Target's representative Chris Case information about Woolwich. (Wolson Decl., Ex. 23.) Case responded that the $24.4 million price proposal included in Verrichia's submission was "about $19 [million] away" from what Target would pay. (Id., Ex. 25.)

Case testified that he never seriously considered Verrichia's offer, both because of the price and "because of the location, size and proximity of Wal-Mart on the site." (Case. Dep., p. 113.) Further, Case had heard from several retailers, including Lowe's, that Woolwich could potentially have issues obtaining permits for sewer and water to the development. (Id., p. 109.) Based upon its real estate department's analysis, in June 2007 Target decided to open a retail store at Logan and sent Defendant Newman Development a Letter of Intent. (See id., p. 105.)

Even after Target had sent the Letter of Intent to Newman Development, Wolfson-Verrichia continued to send Target information about Woolwich.  On December 3, 2007, Case told Steve Wolfson that Target was "moving forward on Logan" and did not "have an interest in pursuing [the] project in Woolwich."  (Wolson Decl., Ex. 27.)  After Wolfson asked for another opportunity to market the idea, Case became even more emphatic and told Wolfson that Target "wouldn't commit to Woolwich if we had a free deal."  (Id.)

Ultimately, Target withdrew its Letter of Intent in 2008, and decided not to open a store at either Logan or Woolwich because of concerns about the declining economy.  (Case Dep., pp. 104-105; Friedman Dep., p. 70.)  Case testified that Target's decisions were based upon its internal analyses and not on any advice from Metro, Hughes or Newman Development.  (Id.)

## B.      Plaintiffs' Discussions With Giant

Wolfson-Verrichia also had contact with Metro in its pursuit of Giant as a potential tenant at the Maiden Creek project.  Giant's plans for expansion included opening a store in the Reading market area in 2008, and it had discussions with Metro about both the Maiden Creek and Berks projects.  (Robinson Dep., pp. 47-49.)  Giant initially preferred Maiden Creek, and by February 2006 had signed a Letter of Intent to open a store there.  (Id., p. 230-33.)  However, Giant continued to monitor developments in the Reading area, and, by the end of 2006, began to explore other options, including Newman Development's Berks project.  (Id.)  On February 14, 2007, Giant withdrew its Letter of Intent, and informed Wolfson-Verrichia that it did not intend to open a store at Maiden Creek.  (Kotch Decl., Ex. 29.)  Giant explained that it was concerned that Maiden Creek would not open in 2008, particularly in light of Wolfson-Verrichia's inability to attract certain co-tenants to the project.  (Id.)  Giant asked Wolfson-Verrichia to keep them informed of any progress, specifically in finding co-tenants.  (Id.)  One day later, on February 15,

8

2007, Giant sent a Letter of Intent to Newman Development for the Berks project.  (Kotch Decl., Ex. 30.)  Giant's real estate employee, Todd Robinson, testified that its decision was made independently and was not influenced by any of the Defendants.  (Robinson Dep., p. 41.)

      **C.**     **Plaintiffs' Discussions with Lowe's and Other Retailers**

Finally, Wolfson-Verrichia had contact with Metro in its efforts to attract Lowe's to both Maiden Creek and Woolwich.  Roy Perez-Daple, Lowe's regional real estate manager for Pennsylvania and New Jersey at the time,[5] testified that he ruled out the Maiden Creek site without much consideration because when he drove past it during a site tour in May 2005, he felt it "was in the middle of nowhere."  (Perez-Daple Dep., pp. 192-193.)  Lowe's eventually decided to open a store at the Berks project instead.  (See id., p. 193.)

Lowe's gave more serious consideration to the Woolwich project.  Metro provided information about that project, as well as other projects in the area, to Perez-Daple in December 2004.  (Wolson Decl., Ex. 29.)  Metro said it was "not a big fan" of Woolwich, and noted that the site still "need[ed] sewer" capacity.  (Id.)  Instead, Metro recommended Logan as "the cleanest deal if they can get zoning," noting that the project already had light and sewer capacity.  (Id.)  Metro provided Lowe's with more information about Woolwich in January 2005, and Perez-Daple met directly with Verrichia and representatives from Metro in February of that year to discuss the project.  (Wolson Decl., Ex. 30.)  Perez-Daple told Verrichia that Lowe's was interested in the Woolwich project, as well as the Mantua and Logan projects, partly because it understood that Target was also considering these locations.  (Verrichia Dep., pp. 240-41, 251.)

_____

[5] As Plaintiffs have pointed out, Perez-Daple is now employed by Metro.

By July 2005, Perez-Daple had narrowed his consideration to Logan and Woolwich. (Wolson Decl., Ex. 28.)  After attending township meetings, having discussions with Verrichia and reviewing reports from Lowe's site development and engineering teams, Perez-Daple had serious concerns about Wolfson-Verrichia's ability to get approvals for sewer and water service at Woolwich.   (Perez-Daple Dep., pp. 116-117, 192-193.)   He recommended that Lowe's proceed with Logan, and, on November 29, 2006, Lowe's informed Wolfson-Verrichia that it was no longer interested in opening a store at Woolwich.  (Kotch Decl., Ex. 35.)

Perez-Daple testified that his decisions regarding both the Maiden Creek and Woolwich projects were based upon his own investigation and the analyses done by the Lowe's development team, and did not "have anything to do with" anything the Defendants had done. (Perez-Daple Dep., pp. 218-219.)

Some retailers represented by brokers other than Metro, including Kohl's and Staples, also expressed initial interest in opening stores at either the Maiden Creek or Woolwich sites, but later decided against it.   (Verrichia Dep., pp. 357-58.)   Representatives from these retailers uniformly testified that their decisions against opening stores at Wolfson-Verrichia's sites were based upon their independent assessments, and had nothing to do with anything the Defendants said or did. (Solomon Dep., pp. 48-50; Kutchner Decl., ¶¶ 27-30; Chadwick Dep., pp. 36-37, 96-99; Cohen Decl., ¶¶ 6-7, 13-15; Coker Dep., pp. 93-94, 102, 106-107; Drew Decl., ¶¶ 29-32; Aristone Decl., ¶¶ 1-9, 17-20.)   Many of these representatives remembered having similar concerns about the population density around the Maiden Creek project and Wolfson-Verrichia's ability to get approvals for water and sewer service at Woolwich.  (Soloman Dep., pp. 37-39, 48-54, 111-12; Chadwick Dep., pp. 35-36, 61-62; Coker Dep., pp. 34-40; O'Malley Dep., pp. 61-62; Aristone Decl., ¶ 12.)

10

**D.       Plaintiffs' Allegations that Metro Improperly Influenced Retailers**

Despite the unequivocal testimony by the retailers' representatives, Plaintiffs allege that their developments failed to attract tenants because Metro, conspiring with Defendants Hughes and Newman Development, used its position as broker to improperly influence retailers to open stores in competing developments in which Metro's principals had financial interests—the Berks project near Reading, and the Logan and Mantua projects in New Jersey.  Until 2006, Metro represented the developer of the Berks project, Newman Reading Associates, LP.[6]  (Wolson Decl., Ex. 2.)[7]  In March 2006, several of Metro's principals and employees obtained a direct financial interest in the Berks project when Newman Development, an entity which these principals partly owned, purchased the property from Newman Reading Associates, LP.  (Kotch Decl., Exs. 2, 50.)

Plaintiffs also point out that Metro's principals had financial interests in the Logan and Mantua sites, which were in competition with the Woolwich site.  Several of Metro's principals owned Logan Retail, LLC, which was part of a joint venture developing the Logan project.  (Kotch Decl., Exs. 51, 52.)  Metro's principals were also involved in a joint venture that owned the Mantua project.[8]  (Verrichia Dep., pp. 241-251.)

---

[6] Newman Reading Associates, LP, is an entirely separate entity from Defendant Newman Development, and is not a named party in this litigation.

[7] Plaintiffs learned about this relationship in July 2005, and Verrichia confronted Niggeman about it at a meeting with Target near the end of that year.  (Verrichia Dep., pp. 161-64.)  Following the meeting, Verrichia complained to Target about the potential conflict of interest that could arise from Metro representing a competing site while acting as Target's broker.  (Id.)  He also expressed concern that he had shared confidential information with Metro in its role as Target's broker that could be used by Metro to gain a competitive advantage.  (Id., pp. 329-330.)

[8] Plaintiffs learned of this financial interest at Verrichia's February 2005 lunch meeting with Perez-Daple from Lowe's.  (Verrichia Dep., pp. 241-251.)

Plaintiffs claim that in order to steer tenants toward the Berks, Logan and Mantua projects, and away from Plaintiffs' Maiden Creek and Woolwich projects, Metro "slanted" their presentations in favor of its own projects, disparaged Plaintiffs' projects and failed to provide retailers with updates on Maiden Creek and Woolwich.  Plaintiffs point to emails sent by Metro advising Lowe's that they were "[n]ot a big fan of the [Woolwich] site," and advising Target to avoid Woolwich because it was located near a "commuter toll road" with "few local residents/shoppers."  (Kotch Decl., Exs. 36, 38.)  They note that Metro told retailers they believed Plaintiffs would have difficulty obtaining sewer, water and other zoning approvals for the Woolwich site, and that construction could be significantly delayed as a result.  (Verrichia Dep., pp. 279-80, 291-94; Kotch Decl., Ex. 39.)  Metro also told retailers that neither Target nor Lowe's were interested in opening a store in the Woolwich project.  (Id., pp. 297, 308-309.)[9] Verrichia further testified at his deposition that he believed Metro failed to forward certain updates about Plaintiffs' projects to retailers, although he could recall only one instance where a retailer told him that Metro had failed to provide them with updates.  (Verrichia Dep., p. 351.)  In any event, Verrichia stated that he provided numerous updates directly to retailers.  (Id.)

Finally, Plaintiffs rely upon the opinion of Kenneth Leonard who has opined that, by slanting their presentations, disparaging Plaintiffs' projects and failing to disclose its financial interests in competing projects, Metro caused several retailers to reject the Maiden Creek and Woolwich developments.  In his expert report, Leonard offers three opinions: (1) that, although

---

[9] Plaintiffs claim that Metro made other disparaging remarks, and misrepresented to several smaller retailers that other retailers were not interested in becoming tenants in Plaintiffs' projects.  (See, e.g., Verrichia Dep., pp. 343-48.)  However, these allegations are supported only by Verrichia's testimony that representatives told him what Metro or other retailers had told them.  Such evidence is inadmissible hearsay and may not be considered at this stage.  Smith v. Allentown, 589 F.3d 684, 694 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.").

site evaluation is a "subjective process," the Woolwich and Maiden Creek sites were "far superior" to the Logan and Berks sites; (2) that by failing to disclose its financial interests in the Logan and Berks sites, Metro gave its retail clients the false impression that its opinions were unbiased; and (3) that Metro "used [its] influence [as broker] . . . to persuade their clients to locate at their sites instead of the [Plaintiffs'] sites."  (Leonard Rept., p. 15.)

## II.   Legal Standards

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.  After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to produce sufficient evidence to allow a reasonable jury to return a verdict in its favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Therefore, to avoid summary judgment "the non-moving party must provide admissible evidence containing specific facts showing that there is a genuine issue for trial." C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005) (quoting Nathanson v. Med. Coll. of Pa., 926 F.2d 1386, 1380 (3d Cir. 1991)).

### III.    Discussion

Defendants argue that the opinions offered by Leonard are inadmissible, and that without those opinions Plaintiffs have failed to produce sufficient evidence to create a genuine issue of fact as to whether Defendants' conduct caused retailers to reject Wolfson-Verrichia's developments.  As causation is an element that Plaintiffs must prove to succeed on each of their claims, Defendants assert that summary judgment is appropriate on all counts.  Defendants also contend that in light of the unequivocal testimony by representatives from every retailer that Defendants did not influence their decisions against opening stores at Woolwich or Maiden Creek, Plaintiffs' failure to produce evidence to the contrary justifies summary judgment.

Plaintiffs respond that the retailers' testimony is not dispositive, as the fact-finder could reject that testimony and instead credit other evidence that Plaintiffs argue supports a finding of causation.  Specifically, Plaintiffs point to the following evidence as creating a genuine issue of fact as to causation:

- Leonard's testimony that Plaintiffs' Maiden Creek and Woolwich sites were superior to Defendants' Berks and Logan sites.

- Leonard's testimony that site selection is "highly subjective," and brokers can influence retailers' decisions.

- Metro's "slanted" presentations to retailers in favor of its own sites and against Plaintiffs' sites.

- Metro's failure to disclose its financial interests in the Berks and Logan sites.

- Leonard's testimony that Metro's "slanted" presentations and failure to disclose its financial interests actually influenced retailers to reject Plaintiffs' sites.

(Pls. Sur-Reply, pp. 2-3.)

In order to survive summary judgment on any of their claims, Plaintiffs must show that Defendants' wrongful conduct was the proximate cause of their asserted injuries.  See Hemi

14

Group, LLC v. City of New York, 130 S.Ct. 983, 989 (2010) (RICO); Labware, Inc. v. Thermo Labsystems, Inc., 2005 WL 1541028, at * 12 (E.D. Pa. Jun. 29, 2005) (citing Synygy, Inc. v. Scott-Levin, Inc., 51 F.Supp.2d 570, 577 (E.D. Pa. 1999)) (Lanham Act false advertising claim); Crivelli v. General Motors Corp., 215 F.3d 386, 394 (3d Cir. 2000) (intentional interference with contract claim requires showing of "actual legal damage as a result of the defendant's conduct."); Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 809 A.2d 243, 246 (Pa. 2002) (commercial disparagement claim requires showing that pecuniary loss resulted from defendant's falsehood); Noon v. Nolte, 729 A.2d 555, 560-61 (Pa. 1999) (misrepresentation requires injury that is proximately caused by reliance on a false statement).

A "proximate cause" is one "that directly produces an event and without which the event would not have occurred." BLACK'S LAW DICTIONARY (9TH ED. 2009).  In other words, it must be both the "but-for" cause and there must be a "direct relation between the injury asserted and injurious conduct alleged."  Hemi Group, 130 S.Ct. at 989.  "A link that is too remote, purely contingent, or indirect is insufficient."  Id. (quotations omitted).  As it applies to the facts at issue here, Plaintiffs must produce sufficient evidence to support a finding that Defendants' wrongful conduct was, at a minimum, a direct cause of a retailers' decision to forego becoming a tenant in the Maiden Creek or Woolwich developments.[10]

---

[10] Additionally, Plaintiffs would have to show that a retailer's refusal to become a tenant actually caused them pecuniary loss, and that the development's failure was not caused by some other intervening or superseding cause such as a failure to obtain sewer and water licenses.  We need not consider whether Plaintiffs can make this showing, however, because the evidence does not support the preliminary finding that Defendants caused a retailer to decline tenancy in any of Wolfson-Verrichia's developments.

With this standard in mind, we consider Plaintiffs' causation evidence.  In light of Plaintiffs' substantial reliance upon the opinions offered by their expert, Kenneth Leonard, we will first consider the admissibility of those opinions.

**A.**     **The Admissibility of the Expert Opinions Offered by Kenneth Leonard**

Defendants have challenged the admissibility of the report and testimony offered by Plaintiffs' expert, Kenneth Leonard, an owner of Leonard Associates, a company that provides "consulting and litigation support services to the shopping center [i]ndustry." (Leonard Curr. Vit., p. 1.)  Before starting his consulting company, Leonard worked for retailers and commercial real estate brokers for nearly thirty years.  (Id.)  As previously stated, Leonard has offered three opinions in this case: (1) that the Maiden Creek and Woolwich sites are "superior" to the Logan and Berks sites; (2) that Metro, in its position as broker, improperly failed to disclose its financial interests in competing projects and slanted its presentations to favor those projects; and (3) that Metro's conduct caused Target and Lowe's to reject Wolfson-Verrichia's sites, which, in turn, caused other retailers to reject those sites as well.  (See Leonard Rept., p. 15; Pl.'s Resp. to Mot. in Limine, p. 1.)

Preliminarily, we note that Leonard's opinion that Metro's conduct was improper is not relevant to the question of causation upon which our summary judgment decision is based. Whether Metro, by failing to disclose its financial interests and slanting its presentations as alleged by Plaintiffs, violated conflict-of-interest standards in the commercial real estate industry, has no bearing on whether that conduct actually caused Plaintiffs to suffer injury.  See, e.g., Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 459 (2006).   We therefore limit our discussion to the admissibility of Leonard's two other opinions—that Wolfson-Verrichia's sites

16

were objectively superior, and that Metro caused actual harm to Plaintiffs by convincing retailers to reject their sites.[11]

To reach his opinions, Leonard drove by the sites at issue, and spoke with the manager of a shopping mall near the Berks site and an assistant manager at a "highly successful" Target store located outside of Reading.  (Leonard Rept., pp. 14-15; Leonard Dep., pp. 85-87, 218-19.) Leonard also reviewed maps of the relevant areas, certain exhibits provided by Plaintiffs and the deposition testimony given by the parties and retailers.  (Id.)

After gathering this information, Leonard assessed the relative strength of the sites at issue by "thinking about it [and] . . . looking at [ ] all the criteria," including population, surrounding highways and geography, and his personal experience with the Reading retail market.  (Leonard Dep., p. 237; Leonard Rept., pp. 11-13.)  In his report, Leonard notes that Plaintiffs' Woolwich site was surrounded by more residential housing, and describes Logan's proximity to a popular commuter interstate as a "minor advantage."  (Leonard Rept., p. 11.) Regarding the sites near Reading, Leonard states that "as a long time observer of the Reading market," it is his experience that retail stores near the Maiden Creek site are more successful than those close to the Berks project.  (Id., p. 13.)  Leonard admitted that he did not perform a "trade area study" or "market research report" to support his conclusions. (Id., p. 238.)  Indeed, he testified that he performed no written analysis whatsoever that would show the assumptions or calculations he made to determine that Wolfson-Verrichia's sites were superior.  (Id., pp. 240-241.)

---

[11] We also question the probative value of Leonard's opinion that Wolfson-Verrichia's sites were "objectively superior" given his statement that site selection is "a highly subjective process." (Leonard Rept., p. 10.)  In any event, whether or not it has probative value is of no consequence in light of our conclusion that it is inadmissible.

Leonard based his opinion that Metro caused retailers to reject Plaintiffs' projects on his review of exhibits provided by Plaintiffs and the deposition testimony of the parties and retailers. Leonard interpreted this evidence in light of his experience and understanding of the standards and practices generally used in the commercial real estate industry, and constructed a narrative explaining why these retailers chose not to become tenants in Wolfson-Verrichia's developments. (See Leonard Rept., pp. 12-13 (concluding Metro influenced retailers based on their economic incentives to do so); Leonard Dep., pp. 144-47.)  Leonard's causation opinion was also informed by his opinion that the Maiden Creek and Woolwich sites were objectively superior, but were nonetheless rejected by the retailers at issue. (See Leonard Rept., p. 13 ("The only explanation for [retailers choosing Berks over Maiden Creek] is (sic) the omissions and conflicts of defendants.").)

Defendants argue that Leonard's opinions are inadmissible because they are not based on reliable methods and fail to meet the "fit" requirement—i.e., they would not assist the trier of fact.  In considering a challenge to the admissibility of expert testimony, the burden is on the proponent of the testimony to demonstrate its admissibility by a preponderance of the evidence. Oddi v. Ford Motor Co., 234 F.3d 136, 144 (3d Cir. 2000).  Federal Rule of Evidence 702 provides that testimony by a qualified expert is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Rule 702 charges trial judges "with the responsibility of acting as 'gatekeepers' to exclude unreliable expert testimony." Calhoun v.

Yamaha Motor Corp., 350 F.3d 316, 320 (3d Cir. 2003) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)).

To meet the reliability requirement of Rule 702, "the expert's opinion must be based on the methods of science rather than on subjective belief or unsupported speculation." Calhoun, 350 F.3d at 321. Although "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness[,]" a litigant must "make more than a prima facie showing that his expert's methodology is reliable." Pineda v. Ford Motor Co., 520 F.3d 237, 247 (3d Cir. 2008) (quotations omitted). The admissibility decision must focus on the expert's "principles and methodology, not on the conclusions that they generate." Meadows v. Anchor Longwall & Rebuild, Inc., 306 Fed. Appx. 781, 789 (3d Cir. 2009) (quoting Daubert, 509 U.S. at 595).

Several factors are relevant to assess whether a particular method is reliable, including: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n. 8 (3d Cir. 1994). These factors "are neither exhaustive nor applicable in every case." Pineda, 520 F.3d at 248 (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806-07 (3d Cir. 1997)).

Rule 702 also mandates that an expert's opinion "help the trier of fact to understand the evidence or to determine a fact in issue." This mandate is typically referred to as the "fit" requirement, and asks whether there is a sufficient connection "between the expert's testimony and the facts that the jury is being asked to consider." United States v. Schiff, 602 F.3d 152,

172-73 (3d Cir. 2010). This requirement focuses on the question of "whether the expert testimony proffered is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Id., at 173 (internal quotations omitted). Rule 702 favors admission of expert testimony if it "has the potential for assisting the trier of fact." Kannankeril, 128 F.3d at 806. Although the standard requires more than bare relevance, it is "not that high." In re Paoli, 35 F.3d at 745.

Defendants argue that Leonard's opinions fail both the reliability and fit requirements for admissibility. They assert that Leonard's opinions are not the product of any identifiable method, but are essentially based upon his ipse dixit,[12] supported only by a subjective interpretation of the evidence. Further, Defendants argue that Leonard performed the analyses in his head, making it impossible to verify, test or reproduce his opinions. Defendants stress that Leonard chose this method despite being aware of an alternative, generally-accepted method for evaluating sites that was in fact used by the retailers to perform site evaluations. Finally, Defendants urge that Leonard's causation opinion is substantially based on an improper assessment of the witnesses' credibility and motivation, and therefore invades the province of the jury.

Plaintiffs respond that Leonard's opinions are supported by a reliable methodology that is set forth in his report. With regard to Leonard's site evaluation, Plaintiffs argue that the process is not a "hard science" and that Leonard properly based his conclusions on his experience and his knowledge of the area. Plaintiffs note that Leonard's report references some of the factors he considered in evaluating the sites at issue, and argue that the drive-by assessment Leonard

---

[12] The Latin phrase "ipse dixit," literally translated as "he, himself, said it," describes a statement that is asserted to be true, but is unsupported by proof. BLACK'S LAW DICTIONARY (9TH ED. 2009).

performed was an acceptable method, even if a more formal market analysis is used by others in the industry.  Finally, Plaintiffs argue that Leonard's causation opinion is based on more than credibility determinations, which they assert he was entitled to rely upon when confronted with contradictory facts.  Specifically, Plaintiffs contend that Leonard based his opinion on the superiority of Plaintiffs' sites and the absence of a reasonable alternative explanation.

We agree with Defendants, and find that Leonard's opinions are unreliable and fail to fit the issues in this case.  The principal problem underlying Leonard's analysis is that there is no meaningful explanation as to how it was performed.  Instead, Leonard stated that he reached his opinions by deliberating upon the evidence, and interpreting it in light of his experience in commercial real estate.  The absence of any explanation regarding his method of applying his experience to the facts (i.e., a method for weighing the various factors accounted for in forming his opinions) renders it impossible to determine whether his opinions constitute results-based judgments or are the product of a reliable methodology.  See Magistrini v. One Hour Martinizing Dry Cleaning, 180 F.Supp.2d 584, 606 (D.N.J. 2002), aff'd 68 Fed.Appx. 356 (3d Cir. 2003) ("[W]ithout a reliable method, result-oriented "judgment" cannot be distinguished from scientifically or methodologically-based judgment.").  Because Leonard failed to articulate any method for weighing the relevant factors, his opinion "is connected to existing data only by the ipse dixit of the expert."  Elcock v. Kmart Corp., 233 F.3d 734, 749 (3d Cir. 2000) (quoting Khumo Tire, Ltd. v. Carmichael, 526 U.S. 137, 156 (1997)).

In explaining how he reached his opinion, Leonard testified that his analysis consisted of "thinking about . . . all the criteria."  (Leonard Dep., p. 237.)  While Leonard's report discusses a few facts that he asserts support his conclusion, it does not "set forth the methodology he used to weigh" all of the factors relevant to his analysis.  Magistrini, 180 F.Supp.2d at 606.  Leonard's

mental consideration of the strengths and weaknesses of the sites at issue is not capable of being tested or subject to peer review, and is reliable only to the extent of his experience.  See In re Paoli, 35 F.3d at 742 n. 8.   While, in certain circumstances, "one can opine based upon experience," there must still be a method by which "that experience is reliably applied to the facts."  Floorgraphics, Inc. v. News America Marketing In-Store Svcs., Inc., 546 F.Supp.2d 155, 179 (D.N.J. 2008).

Further, Leonard's method of site evaluation stands in stark contrast to the formulaic calculations used by the retailers who made the actual decisions as to where to place their stores. These retailers used written analyses and mathematical models to objectively account for factors such as demographics, population, traffic patterns, competition and projected sales.  (See Friedman Dep., pp. 14-17; Perez-Daple Dep., pp. 40-41; Solomon Dep., p. 25; Robinson Dep., pp. 16-17.)  There is no evidence to suggest that touring sites and mentally evaluating them based on experience, and without a standardized method of weighing the relevant factors, is generally-accepted in the commercial real estate industry.  In re Paoli, 35 F.3d at 742 n. 8.

Leonard's causation opinion is similarly unreliable as it too is supported only by his experience regarding the relationship between retailers and real estate brokers, and his subjective interpretation of the depositions and exhibits he reviewed.  When asked whether his process involved anything more than looking at the testimony and coming to an opinion, Leonard provided the following answer:

> [My opinion is based on] forty years of being in the industry and making hundreds and hundreds and hundreds of deals and being involved in these kinds of transactions, these kinds of pulling and tugging between potential locations, and—yes. It wasn't just reading this.  It's also reading and understanding what they mean when they make little snide comments on the e-mails between themselves and—

22

> and how they're position and how they talk to each other.  And also, what isn't there.
>
> There is a—a huge gap in the communication and the lack of any notes from meetings that are normally kept by the vast majority of organizations that I've ever been associated with that will have what went in—on in their weekly status report meetings, et cetera . . .

(Leonard Dep., pp. 144-45.)

This type of "reading between the lines"— drawing conclusions based on the absence of evidence and personal interpretation of the meaning of testimony—is entirely subjective and speculative.  This is particularly so where Leonard limited the evidence he reviewed to what was provided by Plaintiffs.  (Leonard Rept., p. 4, Ex. 2.)  While his interpretation may be informed by his knowledge of the role that a broker has in commercial real estate, it remains impossible to discern any method used by Leonard to reliably weigh the evidence he was examining.  Without such a method, Leonard's judgment about what occurred cannot be considered reliable or scientific.  Paoli, 35 F.3d at 742.

Leonard also improperly assessed the credibility and motivation of witnesses in forming his causation opinion.  For example, Leonard found that David Newman and Steve Niggeman "would take great delight in sticking it to somebody," and were good at "a rather subtle form of salesmanship or influence."  (Id., p. 213.)  He also concluded that Target's real estate employee, Laurie Berkwitz, was highly susceptible to influence, and that "the last person who talked to her seemed to be the one that had the most influence."  (Id., p. 214.)  While Plaintiffs correctly argue that an expert may consider disputed facts in forming their opinion, it is not permissible for an expert to construct an entire narrative about what occurred based upon his own subjective interpretation of the evidence.  See Coney v. NPR, Inc., 312 Fed. Appx. 469, 474 (3d Cir. 2009)

(citing cases).  This is particularly so where, as here, the expert has no specialized knowledge in psychology or credibility-assessment.  (Leonard Dep., pp. 215-16.)

Finally, we note that Leonard's site evaluation also fails to meet the fit requirement.  The question of whether Wolfson-Verrichia's sites were objectively superior is not an issue the fact-finder will be asked to decide.  Rather, it will be called upon to examine how retailers evaluated the sites, and whether Metro improperly influenced their decisions.  Leonard's site evaluation opinion does not address that issue.  He used a methodology completely different than those used by the retailers, and based his opinion on information obtained in August or September, 2012, years after retailers made the decisions relevant to Plaintiffs' claims.  An objective comparison of Plaintiffs' and Defendants' sites performed in 2012 would not assist the trier of fact in their consideration of how the retailers at issue approached the decisions they made between 2004 and 2007.  For these additional reasons, Leonard's site evaluation does not meet the "fit" requirement of Rule 702.

Leonard's opinion that Wolfson-Verrichia's sites are superior to Defendants' is both unreliable and would not assist the jury.  We further conclude that Leonard's opinion that Metro's conduct caused retailers to reject Wolfson-Verrichia's sites is based upon nothing more than his subjective evaluation of the evidence, and is unreliable as a result.  As such, these opinions are inadmissible and may not be relied upon by Plaintiffs in opposing summary judgment.

### B.     Plaintiffs' Remaining Evidence of Causation

Without the opinions offered by Leonard, Plaintiffs' evidence of causation is limited to the information provided by Metro in its role as broker, which Plaintiffs characterize as "slanted" in favor of the Logan and Berks projects, and Metro's failure to disclose its financial interests in

those projects.  Although this evidence may show that Metro's conduct was contrary to industry standards, wrongful conduct, by itself, does not support a finding of causation.  See, e.g., Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 459 (2006) (plaintiff must produce separate evidence showing that defendant's tax fraud caused an injury for RICO claim).  Rather, Plaintiffs must point to evidence tending to show that Defendants' conduct, rather than the independent analysis and business judgment of the retailers, was the cause of the decision by those retailers to reject Wolfson-Verrichia's projects.  Plaintiffs have failed to identify any such evidence.

First, there is no evidence Target, Lowe's or Giant would have made a different decision had Metro disclosed its financial interests in the Logan and Berks projects.  While representatives from Staples and Kohls testified that they would look more closely at information provided by a broker regarding a development in which it had a financial interest, neither of these retailers were represented by Metro.  (See Solomon Dep., pp. 122-23 (Staples); Chadwick Dep., pp. 151-52 (Kohls)).  Further, both Staples' and Kohls' representatives testified that those retailers have previously opened stores in developments where the broker had a financial interest in the project.  (Id.)  More importantly, the retailers represented by Metro all testified that the fact that Metro may have had financial interests in these developments had no impact on their analysis and decision-making process.  (Mahowald Dep., pp. 22-23; Case Dep., pp. 104-105, 113; Robinson Dep., p. 41; Perez-Daple Dep., pp. 218-219.)[13]

While it may be that Metro had a duty as a broker to inform its retail clients of its financial interests in the projects at issue, there is no evidence that its failure to do so affected

---

[13]Indeed, Verrichia told Chris Case from Target that Metro had an interest in the Mantua and Logan projects in 2005.  (Case Dep., pp. 225-227.)   Case testified that it did not change his analysis, and he continued to recommend the Logan project.  (Id.)

those retailers' decisions.  It is also worth noting that this duty was owed to Metro's clients and not to Plaintiffs.  Indeed, Plaintiffs have not produced evidence of any relationship between the parties, or suggested circumstances that would permit them to enforce obligations that Metro owed to its retail clients.

Plaintiffs' allegation that Metro was "slanting" its presentations in a way that disfavored the Woolwich and Maiden Creek sites is similarly misplaced.  Specifically, Plaintiffs assert that Metro disparaged the Maiden Creek and Woolwich projects and failed to forward information about those projects to the retailers it represented.[14]  Even assuming this to be true, again, Plaintiffs must still produce evidence to show that its disparagement had an effect on retailers' decisions.  The retailers testified that they relied upon their own real estate departments and market research and analysis teams, rather than on the opinions of their brokers, in deciding where to open stores.  Plaintiffs have failed to produce any affirmative evidence to contradict this testimony.  Without such evidence, there would be no basis for a fact-finder to conclude that Defendants' conduct, even if improper, caused harm to Plaintiffs.

**IV.  Conclusion**

While there may be evidence to show that Metro, by failing to disclose its financial interests in the Berks and Logan projects and "slanting" its presentations in favor of those projects, acted improperly in its role as broker, there is no evidence that this conduct caused any

---

[14] We note that these allegations also lack evidentiary support.  Other than one instance where a representative from J.C. Penny told Verrichia she had not received updates about the Woolwich project—a statement that is likely inadmissible hearsay—Plaintiffs have not identified any updates that Metro failed to forward to retailers.  (Verrichia Dep., p. 161.)  Further, while Metro's comments about the poor location of Wolfson-Verrichia's projects, and its estimates about the projects' difficulty in obtaining water and sewer approval, may have been "disparaging," there is no evidence that they were false statements of fact.  Rather, these statements appear to be opinions about the strengths and weaknesses of these projects.

harm to Plaintiffs.  Rather, testimony by every retailer indicates that Wolfson-Verrichia's sites were rejected based upon the retailers' independent market research and site evaluations. Plaintiffs have not offered any evidence suggesting otherwise.  The opinions offered by Plaintiffs' expert that might tend to support a finding of causation are inadmissible, and the other evidence identified by Plaintiffs is only probative of whether Metro's conduct in its role as broker was improper.  Plaintiffs have failed to identify evidence creating a genuine issue of fact as to causation, and summary judgment is therefore appropriate.

Our Order follows.